**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| TRILINK SAW CHAIN, LLC, and TRILINK GLOBAL, LLC, | |
|     Plaintiffs, Counter-Defendants | |
|       v. | CIVIL ACTION NO. 1:07-CV-0409-CAP |
| BLOUNT, INC., and OREGON CUTTING SYSTEMS GROUP, | |
|     Defendants, Counter-Plaintiffs. | |

## O R D E R

This matter is before the court on the plaintiffs' motion for summary judgment [Doc. No. 149]; the defendants' motion for partial summary judgment [Doc. No. 157]; the defendants' motion to exclude the plaintiffs' technical expert [Doc. No. 160]; the plaintiffs' motion to unseal documents [Doc. No. 210]; the plaintiffs' request for immediate scheduling of trial [Doc. No. 216]; and the defendants' motion for leave to file a surreply to the plaintiffs' request for immediate scheduling of trial [Doc. No. 220].

## Case Overview

Defendant Oregon Cutting Systems Group, a division of defendant Blount, Inc., (collectively, "Oregon"), is one of the world's leading manufacturers and marketers of saw chain, guide bars, and chain drive sprockets for chain saws. It designed and

manufactured its first saw chain in the 1940s, the basic design of which is still widely used today.

Plaintiffs Trilink Saw Chain, LLC and Trilink Global, LLC (collectively, "Trilink") are companies that are also involved in the business of marketing, distributing, and selling chain saw components and accessories. Trilink was founded and began selling saw chain in or around 2005. It entered the consumer saw chain market in competition with Oregon because Trilink's principals saw an opportunity in an industry where there were principally two United States players, Oregon and non-party Carlton Company.

In 2005, Oregon had an estimated 57% market share for saw chain sales. However, Oregon considered Trilink a threat. Thus, in March 2006, Oregon prepared a memorandum comparing the Oregon chain and Trilink chain. This memorandum summarized the results of internal tests conducted by Oregon on Oregon and Trilink chain. Oregon pulled the highlights from this memorandum and placed them in a one-page abstract ("the Oregon Abstract"). Oregon discussed the contents of the Oregon Abstract with several customers and provided them with a copy of it at various times between March and November 2006.

In the summer of 2006, Oregon contracted third-parties Cincinnati Testing Laboratories ("CTL") and Svensk Maskinprovning ("SMP") to conduct additional tests on the Oregon and Trilink

chain. After receiving CTL and SMP's test reports, Oregon prepared a comparative, six-page memorandum ("the Oregon Memo"). Oregon disseminated the Oregon Memo to customers throughout October and November 2006.

In 2006, Oregon also prepared a brochure ("the Oregon Brochure") entitled "Eight Important Considerations In Choosing Your Partner for Saw Chain," which it disseminated to its customers. [Doc. No. 126, Composite Ex. B]. This brochure purports to set forth a list of criteria that should be considered when choosing a saw chain provider.

Trilink alleges that Oregon's Abstract, Memo, and Brochure, along with other documents, (collectively, "the marketing materials") contain literally false or misleading statements intending to deceive or having the capacity to deceive potential buyers as to the strength, performance, and safety of the Trilink chain. Thus, Trilink filed this case on February 16, 2007,[1] alleging that Oregon violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370 [Doc. No. 1]. In addition, Trilink alleges that Oregon, by way of its deceptive advertisements,

---

[1] Trilink filed an amended complaint on September 21, 2007 [Doc. No. 126].

tortiously interfered with Trilink's business relations with third-parties in contravention of Georgia common law.

Oregon has largely denied Trilink's allegations and has filed counterclaims against Trilink alleging trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and unfair competition under both Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and O.C.G.A. § 10-1-393 et seq. Specifically, Oregon contends that Trilink's use of the term "PROLINE" in connection with the sale of chain saw accessories unlawfully infringed upon Oregon's "PRO-LITE" trademark that it uses on and in connection with chain saw guide bars.

On November 2, 2007, Trilink filed for summary judgment on Oregon's counterclaims [Doc. No. 149]. Three days later, Oregon filed for summary judgment on Trilink's claim for monetary relief under its false advertising claim and on Trilink's tortious interference with business relations claim [Doc. No. 157]. Subsequently, Oregon moved to exclude Trilink's technical expert [Doc. No. 160], Trilink moved to unseal documents [Doc. No. 210] and for immediate scheduling of trial [Doc. No. 216], and Oregon moved for leave to file a surreply to Trilink's motion for immediate scheduling of trial [Doc. No. 220].

**<u>Pending Motions</u>**

I.  **<u>Oregon's Motion to Exclude Trilink's Technical Expert [Doc. No. 160]</u>**

To show that Oregon's advertisements contain false and misleading claims, Trilink hired Hal I. Dunham as a technical expert.  Dunham is a mechanical engineer who professes to have over 19 years of product testing experience.  Trilink hopes to use Dunham's testimony to demonstrate that Oregon's marketing materials make claims that are unsupported by the testing data on the Oregon and Trilink chain.  Trilink claims that Dunham will offer significant testimony which addresses: (1) how product testing generally is conducted, including the product design process; (2) how the Oregon testing diverged from normal product testing practices; and (3) how the Oregon test materials do not support the claims made therein.  Trilink's Resp. Br., p. 8 [Doc. No. 181].

Dunham has already set forth much of his proposed testimony in an expert report [Doc. No. 160, Ex. A].  In this report, Dunham makes 19 conclusions, allegedly on the basis of his "education, experience, training and on the evidence currently obtained by and reported to him."  <u>Id.</u> at pp. 1-2.  In support of these conclusions, Dunham makes 18 "findings and observations" regarding the testing that was conducted.  <u>Id.</u> at pp. 5-12.

Oregon has moved to exclude Dunham as a witness. Oregon claims that Dunham is not qualified to testify regarding the matters in this case because he has no professional and limited personal experience with saw chain and no experience with consumer surveys or consumer marketing research. Moreover, Oregon contends that the testimony that Dunham will offer does not constitute "expert" testimony and thus will not assist the trier of fact.

Both parties had an opportunity to develop their arguments on this matter at a hearing held on July 30, 2008. Accordingly, this order will take into consideration the issues discussed at that hearing as well as the issues presented in the briefs.

## A.    <u>Legal Standard for Excluding Expert Testimony</u>

Federal Rule of Evidence 702 governs the admissibility of expert testimony. This rule states,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The district court is obligated to act as a gatekeeper to the admission of expert testimony. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 597 (1993). Thus, the

-6-

district court generally engages in a three-part inquiry derived from Rule 702 to determine the admissibility of expert testimony. <u>Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1340-41 (11th Cir. 2003). Specifically, the district court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Id.</u> (citing <u>City of Tuscaloosa v. Harcros Chemicals, Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998)). The same standard applies to all expert testimony, including testimony regarding scientific, technical, and other specialized matters. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147 (1999).

As noted above, Oregon contends (1) that Dunham is unqualified to testify to the issues in this case and (2) that Dunham's testimony, which allegedly does not utilize a technical, scientific, or other specialized methodology, will be unhelpful to the trier of fact. Each of these arguments will be addressed below.

**B. Is Dunham Qualified to Testify?**

**1. Legal Standard for Expert Witness Qualification**

"Rule 702 takes a liberal view of expert witness qualifications." <u>Leathers v. Pfizer, Inc.</u>, 233 F.R.D. 687, 692 (N.D. Ga. 2006) (citations omitted). It does not mandate that an expert be recognized as a leading authority in the field in question; instead, it simply requires that he or she be "competent and qualified by knowledge, skill, experience, training, or education to render the opinion." <u>Id.</u> (citing <u>Siharath v. Sandoz Pharmaceuticals Corp.</u>, 131 F. Supp. 2d 1347, 1351 (N.D. Ga. 2001), <u>aff'd sub nom.</u> <u>Rider v. Sandoz Pharmaceutical Corp.</u>, 295 F.3d 1194 (11th Cir. 2002)). Thus, if there are "[g]aps in an expert witness's qualifications or knowledge[, they] generally go to the weight of the witness's testimony not its admissibility." <u>Id.</u>

Often, as in this case, courts are faced with determining whether an expert's testimony exceeds his qualifications. As noted above, Rule 702 takes a liberal view of expert witness qualifications; thus, "an expert's training does not always need to be narrowly tailored to match the exact point of dispute in a case." <u>McGee v. Evenflo Co.</u>, No. 5:02-cv-259-4 (CAR), 2003 U.S. Dist. LEXIS 25039, at *7-8 (M.D. Ga. Dec. 11, 2003) (finding that a mechanical engineer with some experience involving accident reconstruction and safety restraints was minimally qualified to

testify about the performance of a car seat in an accident).
Indeed, an expert with "the education or background to permit him
to analyze a given set of circumstances . . . can through reading,
calculations, and reasoning from known scientific principles make
himself very much an expert in [regard to] the particular product
even though he has not had actual experience" with the product.
Santoro v. Donnelly, 340 F. Supp. 2d 464, 473 (S.D.N.Y. 2004).
However, a witness may not qualify - through reading and
preparation - as an expert in "an entirely different field or
discipline." Lappe v. American Honda Motor Co., Inc., 857 F. Supp.
222, 227 (N.D.N.Y. 1994). Instead, he must "stay within the
reasonable confines of his subject area." Id. Thus, many courts
have excluded testimony when they determine that the witness is
testifying to an area outside of - but related to - his expertise.
See, e.g., Wheeling Pittsburgh Steel Corp. v. Beelman River
Terminals, Inc., 254 F.3d 706, 715 (8th Cir. 2001) (concluding that
a hydrologist specializing in flood risk management was not
qualified to testify to safe warehousing practices in an action in
which a warehouse was flooded); Redman v. John D. Brush & Co., 111
F.3d 1174, 1179 (4th Cir. 1997) (finding that a metallurgic
engineer, who was undoubtedly qualified to testify about the
properties and characteristics of metal, was not qualified to
testify about industry standards for a safe because he had never

before analyzed a safe, engaged in the manufacture or design of safes, or received any training regarding safes). Similarly, courts have excluded expert testimony that might implicate the expert's field or discipline if the expert has no specific experience or background with the topic in dispute and has not satisfied the court that he has obtained expertise in regard to the topic in preparation for litigation. See, e.g., United States v. Brown, 415 F.3d 1257, 1269 (11th Cir. 2005) (upholding district court's refusal to qualify a chemistry consultant as an expert in controlled substances because he did not have a chemistry degree and had only worked with the chemical substance at issue in the case on "isolated projects"); Wright v. Case Corp., No. 03-cv-1618-JEC, 2006 U.S. Dist. LEXIS 7683, at *9-10 (N.D. Ga. Feb. 1, 2006) (finding that a mechanical engineer was not qualified to testify that the product at issue was defective or to offer alternative designs because he "had very little experience with the machinery at issue," and had not "made a serious effort to gain expertise since [being] retained as an expert.").

## 2. **Application of Legal Standard**

As noted above, Dunham seeks to testify regarding: (1) general product testing procedures; (2) how Oregon's product testing procedures diverge from normal product testing procedures; and (3) how Oregon's marketing materials do not support the testing claims

therein.  Dunham's curriculum vitae and deposition testimony reveal that he is qualified to testify to all three of these topics. Dunham is a mechanical engineer at CTL Engineering, Inc., where his professed responsibilities include "the development of testing methods specifying the test apparatus to be used, and procedures to be followed in technical investigational projects." Dunham Curriculum Vitae, attached as exhibit to Dunhan Report [Doc. No. 160, Ex. A].  His projects at CTL include "product reliability investigations, vehicular accident reconstructions, failure analysis, product testing, and engineering consultations." Id. Dunham testified that he has spent the last 19 years conducting product tests, and further testified that he has reviewed multiple test reports.  Thus, he is clearly competent to testify to general product testing procedures, to comment on how Oregon's testing procedures conform with or diverge from general product testing procedures, and to generally comment on whether Oregon's tests resulted in the findings advertised by Oregon.

However, Dunham's actual testimony, as articulated in his expert report and at the hearing on this matter, goes beyond the three topics set forth by Oregon.  For example, Dunham testifies authoritatively in regard to how the average consumer would interpret Oregon's language in the advertisements.  In addition, Dunham attempts at various points to interpret consumer research

data.  Despite Dunham's testimony, Dunham admitted at the <u>Daubert</u> hearing that he was neither a consumer survey expert nor a market research expert, and his counsel informed the court that he was not being offered for his testimony in those areas.  Thus, Dunham is clearly unqualified to render such testimony.

Similarly, in his expert report and in his testimony at the <u>Daubert</u> hearing, Dunham makes many conclusions regarding saw chain, typical saw chain practices and uses, and saw chain industry standards.  However, the record reflects that Dunham is not an expert in regard to chain saws or saw chain.  He has received no education or training specific to chain saws or saw chain.  He has not attended any seminars regarding saw chain, and he has not had any experience with chain saws, saw chain, or the testing of these items during his time as a professional engineer.  Moreover, he has not been involved in any litigation (other than the present case) dealing with the properties or design of saw chain or the testing of this product.  In fact, Dunham's only experience with chain saws or saw chain prior to this litigation comes from his personal use of a chain saw he received as a gift roughly ten years ago.  While Dunham did undertake some activities to familiarize himself with the chain saw industry in preparation for this case,[2] these

---

[2]     To prepare for this case, Dunham read Trilink and MTD's joint market report, reviewed an Applied Technical Service, Inc.

preparations gave him background - not expertise - with regard to saw chain. Thus, Dunham is not qualified to testify as an expert in this regard, either.

Some examples of the conclusions that Dunham is not qualified to testify to include:

### *Expert Report Conclusion E*

Conclusion E of Dunham's expert report states, "Oregon's claim that chain breakage is the most important attribute for durability is without basis and ignores more common saw chain durability characteristics." [Doc. No. 160, Ex. A, p. 1]. This testimony is inadmissible because Dunham has no expertise - through education, experience, or preparation for this case - in regard to saw chain and, thus, is not qualified to make statements or conclusions regarding common saw chain durability characteristics.

In addition, in his findings and observations, Dunham further states that chain breakage is a "rare occurrence." However, at the <u>Daubert</u> hearing, Dunham admitted that he does not know what the rate of saw chain breakage is and thus implicitly conceded that he

---

test report, researched Consumer Product Safety Commission saw chain recalls, and searched online for appropriate industry standards. In addition, he purchased a Home Depot Power Care Y saw chain and an Oregon S6291 low profile saw chain and held discussions with Steve Lacy, Trilink's president, concerning improvements made to the Trilink saw chain. Finally, he reviewed many of the depositions and court filings related to this case.

was merely speculating that it was rare.  Accordingly, Dunham is not qualified to make this statement.

*Expert Report Conclusion F*

In Conclusion F, Dunham refutes Oregon's statement that "durability issues will plague the Linbo products as well as pose a potential safety hazard," by concluding that "[t]he durability issues concerning saw chain breakage and injury with Trilink saw chain is [sic] unfounded and unsupported since no known incidents exist."[3]  Id. at pp. 2, 8.  In his findings and observations, Dunham explains this conclusion further, noting that "[n]ot one case of a Trilink saw chain breaking and causing an injury is known."  Id. at p. 8.

Although Dunham is qualified to look at Oregon's tests to determine whether they tested for and found "durability issues" and injuries resulting therefrom, he may not testify to or refute whether substantiated durability issues will cause a potential safety threat.  At the Daubert hearing, Dunham admitted that he does not know if chain breakage leads to injury of chain saw users. Accordingly, it is impermissible for him to opine on the potential

---

[3]    The same factory that produces the Trilink chain also produced a chain offered under the name Linbo.  In its testing, Oregon equated the Trilink chain with the Linbo chain; however, Trilink argues that the chains are different.

safety hazard of Trilink's product if there are any durability issues.

### *Expert Report Conclusion G*

In Conclusion G, Dunham states, "The Oregon test methods for tensile, fatigue, and NCB [nose clear bucking] are not industry standard." <u>Id.</u> at p. 2. Dunham is not qualified to make this statement. At the <u>Daubert</u> hearing, he testified that the only industry standards that he could find for saw chain testing were the American National Standards Institute ("ANSI") standards for kickback testing. He also testified that he does not know exactly who the competitors are in the saw chain industry, and indicated that he does not know how they test their products. In other words, he does not know how the industry conducts tensile, fatigue, and NCB testing and thus cannot testify in regard to what the industry standard is for these tests.

### *Expert Report Conclusion H*

Conclusion H states, "The Oregon fatigue testing does not simulate the stress cycles that a saw chain would experience in actual service cutting of wood." <u>Id.</u> at p. 2. First, Dunham, who is not an expert in saw chain or consumer use of saw chain, is not qualified to testify regarding what constitutes the "actual service cutting of wood." Secondly, Dunham, who never tested the accelerated test that Oregon conducted and never conducted his own

accelerated test, did not use a reliable methodology to opine on whether the Oregon fatigue testing simulated, albeit in an accelerated fashion, the experiences that a saw chain user would experience in real life. Accordingly, this testimony should not be admitted.

### *Expert Report Conclusion J*

Dunham's Conclusion J states, "Oregon assumes that 'what matters to a novice chain saw user is how much wood he can cut in a given period of time' when the joint Trilink and MTD consumer research indicates otherwise." Id. at p. 2. As noted above, Dunham is not a consumer research expert; thus, nothing in his background qualifies him to interpret consumer research data. Accordingly, this testimony is inadmissable.

### *Expert Report Conclusion K*

Conclusion K states, "The NCB test method has no direct relation to typical consumer use." Id. at p. 2. As noted above, Dunham does not have expertise in regard to what constitutes typical consumer use of saw chain; accordingly, he is not qualified to make this statement.

### *Expert Report Conclusion S*

Conclusion S states, "The Oregon implication that Trilink saw chain should be recalled is not substantiated by any industry standards, government standards, or public safety testing body."

Id. at p. 2.  As discussed above, with the exception of kickback testing, Dunham is not aware of any publicized standards regarding saw chain testing.  In addition, Dunham is not aware of how the other companies in the saw chain industry perform tests.  Consequently, he is not qualified to testify to saw chain industry standards outside of those used in kickback testing.

### C. **Is Dunham's Testimony "Helpful" to the Trier of Fact?**

In addition to contending that Dunham is unqualified as an expert, Oregon also contends that his testimony is unhelpful to the trier of fact.  The court will address Oregon's argument below.

### 1. **Legal Standard for Assessing the "Helpfulness" of Proposed Testimony**

"One of the fundamental requirements of Rule 702 is that the proposed testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  In re Rezulin Products Liability Litigation, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (citation omitted).  Thus, multiple courts have concluded that expert testimony

> may properly be excluded in the discretion of the trial judge if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.

<u>Salem v. United States Lines Co.</u>, 370 U.S. 31, 35 (1962) (internal citations omitted); <u>see</u> <u>also</u> <u>In re Rezulin Products Liability Litigation</u>, 309 F. Supp. 2d at 541 ("Rule 702 ensures that expert witnesses will not testify about lay matters which a jury is capable of understanding and deciding without the expert's help. . . . [E]xperts should not be permitted to supplant the role of counsel in making arguments at trial, and the role of the jury in interpreting the evidence."). Indeed, the Eleventh Circuit has concluded that an expert's testimony is inadmissible if the "trier of fact is entirely capable of determining whether or not to draw [the expert's] conclusions without any technical assistance" from the expert. <u>Harcros Chemicals, Inc.</u>, 158 F.3d at 565 ; <u>United States v. Rouco</u>, 765 F.2d 983, 995-96 (11th Cir. 1985) (characterizing as "valueless" expert testimony that offers "nothing beyond the understanding and experience of the average citizen.").

### 2. <u>Application of Legal Standard</u>

Oregon complains that much of Dunham's testimony is inadmissible because he does not provide opinions relating to any technical aspect of the saw chain tests and instead makes conclusions that the trier of fact could have easily made without his assistance. For example, Dunham concluded that "Oregon did not perform 'many' of their own comparative tests of the Trilink Y and

Oregon 91P saw chain." Dunham Report, Conclusion D [Doc. No. 160, Ex. A]. When asked in deposition how he arrived at this conclusion, he testified that "in [his] review of the test documents, [he] did not find many tests." Dunham Dep. 27:6-11 [Doc. No. 175]. Because the trier of fact could read the same documents and count the number of tests, Oregon contends that such testimony should not be admitted.

Although Rule 702 requires experts to provide evidence that assists the trier of fact, the court does not interpret it to prohibit all conclusions that the trier of fact might be able to make without the expert's help. The expert's role is to interpret the evidence in the case; to do so in a logical fashion, he or she must frequently begin with obvious conclusions from the evidence. For example, Dunham states in his expert report that "Oregon wrongly identifies the Trilink Y saw chain as Linbo and attributes Linbo test results as Trilink test results." Dunham Report, Conclusion A [Doc. No. 160, Ex. A]. This statement, which required nothing more than a review of the documents, did not necessarily require Dunham's expertise. At the hearing, however, Dunham used this statement as the basis for his conclusion that Oregon deviated from an important component of product testing: proper sample identification. This conclusion, which ultimately bears upon the reliability of Oregon's testing procedures, clearly implicates

-19-

Dunham's expertise and assists the trier of fact in interpreting the evidence. However, if Dunham were prohibited from stating that Oregon misidentified the Trilink and Linbo chain simply because the trier of fact could reach the same conclusion, he would have no basis to make his ultimate expert conclusion. Obviously, Rule 702 does not contemplate such a scenario.

Because obvious conclusions are frequently a foundation for expert opinion, the court will not comb through Dunham's testimony and reject non-prejudicial statements simply because they are obvious. Dunham's proposed testimony appears to be related to his ultimate goal of evaluating the product testing and results; accordingly, the court will not exclude any of Dunham's proposed testimony on the grounds of unhelpfulness at this time.

### D. **Conclusion**

As described above, Dunham is qualified to testify to those matters within his expertise as a product tester, but is not qualified to testify to matters beyond that expertise, such as matters regarding consumer interpretation and perception of advertisements, consumer research data, and matters regarding saw chain usage and industry standards (other than those used for kickback testing). Moreover, Dunham is permitted to make statements and conclusions that the trier of fact could make so long as those statements and conclusions are used in the

development of his expert opinions. If the parties have any questions regarding the admissibility of Dunham's proposed testimony, the court will entertain such questions and concerns at a time closer to the date of trial.

**II.  The Parties' Motions for Summary Judgment [Doc. Nos. 149 and 157]**

>   **A.   Summary Judgment Standard**

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This may be accomplished by showing that the nonmoving party will be unable to "establish the existence of an element essential to [the nonmoving] party's case, and on which [the nonmoving] party will bear the burden of proof at trial." Id. at 322.

Once the moving party has met its burden, the burden shifts to the nonmoving party to "designate specific facts showing that there is a genuine issue for trial." Id. at 324 (internal quotation marks omitted). There is a genuine issue if the combined body of

evidence, viewed in the light most favorable to the nonmoving party, would allow a reasonable jury to find in favor of the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In other words, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Id.</u> at 251-52.

**B.  <u>Trilink's Motion for Summary Judgment [Doc. No. 149]</u>**

On July 29, 2005, Trilink filed for registration of its trademark, PROLINE, for use in connection with "chain saw parts and accessories, namely saw chain, guide bars, sprockets, files, file guides, and blades in International Class 7."  Trilink's Statement of Facts, ¶ 11 [Doc. No. 149, Ex. 2] (internal punctuation omitted).  Trilink chose PROLINE because the name provided flexibility to be used later with products beyond chain saw accessories.

On February 26, 2006, the United States Patent & Trademark Office ("PTO") examiner reviewed marks in Trilink's class.  The PTO found no marks that it considered likely to cause confusion.  On or about April 5, 2006, the PTO published the PROLINE mark for opposition.

Oregon is the owner of PRO-LITE, an incontestable trademark that it uses for chain saw guide bars.  On August 23, 2006, Oregon

opposed Trilink's PROLINE registration to protect the PRO-LITE mark.

Trilink was unaware of Oregon's PRO-LITE mark until it received Oregon's opposition to Trilink's registration.[4] However, upon receipt of Oregon's opposition in or around September 2006, Trilink elected to abandon PROLINE and select another brand name for future use. It immediately ceased obtaining new business under the PROLINE brand but continued to ship PROLINE products to Ammars,[5] its only United States PROLINE customer, until April 2007. On February 5, 2007, Trilink abandoned its PROLINE trademark application.

As noted above, Oregon has filed its counterclaims to recover for Trilink's allegedly infringing use of the PROLINE mark. Specifically, Oregon has alleged trademark infringement in violation of Section 32(1) of the Lanham Act and unfair competition under federal and state law. Trilink has moved for summary judgment on all of Oregon's counterclaims.

---

[4]     The court notes Oregon's argument that Trilink had constructive notice of the PRO-LITE mark based on Oregon's federal trademark registration.

[5]     Ammars is a small chain out of Bluefield, West Virginia.

## 1.  <u>Oregon's Claim for Trademark Infringement</u>

A trademark is "any word, name, symbol or device, or any combination thereof used to identify and distinguish one's goods from those manufactured or sold by others and to indicate the source of the goods." <u>Leigh v. Warner Brothers, Inc.</u>, 212 F.3d 1210, 1216 (11th Cir. 2000) (citing 15 U.S.C. § 1127) (internal punctuation omitted).  "In a trademark infringement action, the plaintiff must show, first, that its mark is valid and, second, that the defendant's use of the contested mark is likely to cause confusion." <u>Dieter v. B&H Industries of Southwest Florida, Inc.</u>, 880 F.2d 322, 326 (11th Cir. 1989) (citations omitted).  Because Oregon's PRO-LITE mark is the subject of an incontestable federal registration, its validity is presumed.  <u>Id.</u>  Indeed, Trilink does not dispute the validity of Oregon's mark, but instead focuses its brief on the likelihood of confusion element.

To determine whether there is a likelihood of confusion between two marks, the Eleventh Circuit has developed a seven-factor inquiry.  Under this inquiry, the court must assess:

> (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and the defendant; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the

plaintiff's established mark; and (7) actual
confusion.

North America Medical Corp. v. Axiom Worldwide, Inc., 522 F.3d
1211, 1220 (11th Cir. 2008) (citing Alliance Metals, Inc. v. Hinley
Industries, Inc., 222 F.3d 895, 907 (11th Cir. 2000)).  "Of these,
the type of mark [i.e., the strength] and the evidence of actual
confusion are the most important."  Planetary Motion, Inc. v.
Techsplosion, Inc., 261 F.3d 1188, 1201 n.22 (11th Cir. 2001)
(citing Dieter, 880 F.2d at 326).

### a.    The Strength of Oregon's PRO-LITE Mark

"The strength of a trademark is essentially a consideration of
distinctiveness."  BellSouth Corp. v. Internet Classifieds of Ohio,
1:96-cv-0769-CC, 1997 WL 33107251, at *14 (N.D. Ga. Nov. 12,
1997)(citations omitted).    The stronger (i.e., the more
distinctive) the mark, "the greater the scope of protection
accorded it, [and] the weaker the mark, the less trademark
protection it receives."    Frehling Enterprises, Inc. v.
International Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir.
1999); see also Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,
716 F.2d 833, 840 (11th Cir. 1983) ("[T]he more distinct the
plaintiff's mark, the stronger it is considered, and the more
protection it is accorded from confusingly similar marks.")
(questioned on other grounds by Hi Limited Partnership v. Winghouse

-25-

<u>of Florida, Inc.</u>, No. 6:03-cv-116-ORL-22JGG, 2004 U.S. Dist. LEXIS 30687, at *25 (M.D. Fla. Oct. 5, 2004)).

In this circuit, the factors generally considered when determining the strength of a trademark include (1) the type of mark; (2) the amount of use of the term by others in the same product and geographical area, and (3) the extent of a mark's use, taking into consideration the amount of advertising and promotion done under the mark. <u>Gold Kist, Inc. v. Conagra, Inc.</u>, 708 F. Supp. 1291, 1297 (N.D. Ga. 1989)(citing <u>John H. Harland Co. v. Clarke Checks, Inc.</u>, 711 F.2d 966, 973-75 (11th Cir. 1983)); <u>BellSouth Corp.</u>, 1997 WL 33107251, at *14 (citing <u>John H. Harland Co.</u>, 711 F.2d at 973-75 and <u>Safeway Stores, Inc. v Safeway Discount Drugs, Inc.</u>, 675 F.2d 1160, 1164 (11th Cir. 1982)).

### (1) **Type of Trademark**

"Terms which may be registered as trademarks fall into four categories of strength: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary." <u>Dieter</u>, 880 F.2d at 327.

> The categories are based on the relationship between the name and the service or good it describes. Generic marks are the weakest and not entitled to protection - - they refer to a class of which an individual service is a member (e.g., "liquor store" used in connection with the sale of liquor). Descriptive marks describe a characteristic or quality of an article or service (e.g., "vision center" denoting a place where glasses are sold). Suggestive terms suggest characteristics of the goods or services and

require an effort of the imagination by the consumer in order to be understood as descriptive. For instance, "penguin" would be suggestive of refrigerators. An arbitrary mark is a word or phrase that bears no relationship to the product (e.g., "Sun Bank" is arbitrary when applied to banking services). Arbitrary marks are the strongest of the four categories.

Frehling Enterprises v. International Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir. 1999) (internal citations omitted). While suggestive and arbitrary marks are presumed entitled to protection, descriptive marks will be protected only when secondary meaning is shown.[6] Sun Banks of Florida, Inc. v. Sun Federal Savings and Loan

---

[6] "Secondary meaning is the connection in the consumer's mind between the mark and the provider of the service." Investacorp, Inc. v. Arabian Investment Banking Corp., 931 F.2d 1519, 1525 (11th Cir. 1991); see also Welding Services v. Forman, 509 F.3d 1351, 1358 (11th Cir. 2007) (citations omitted) ("A name has acquired secondary meaning when the primary significance of the term in the minds of the consuming public is not the product but the producer.").

A proprietor can make a prima facie showing of secondary meaning by showing that the name has been used in connection with the proprietor's goods or service continuously and substantially exclusively for five years. Whether a name has attained secondary meaning depends on the length and nature of the name's use, the nature and extent of advertising and promotion of the name, the efforts of the proprietor to promote a conscious connection between the name and the business, and the degree of actual recognition by the public that the name designates the proprietor's product or service.

Welding Services, 509 F.3d at 1358 (citing 15 U.S.C. § 1052(f) and Conagra, Inc. v. Singleton, 743 F.2d 1508, 1513 (11th Cir. 1984)).

<u>Association</u>, 651 F.2d 311, 315 (5th Cir. 1981).

In this case, neither party attempts to categorize the PRO-LITE mark as generic, descriptive, suggestive, or arbitrary. Instead, both agree that PRO-LITE, as an incontestable mark, "is presumed to be at least descriptive with secondary meaning." <u>Dieter</u>, 880 F.2d at 329; <u>see also</u> <u>Frehling</u>, 192 F.3d at 1336 (noting that a mark's incontestability serves to enhance its strength). The Eleventh Circuit has previously stated that such marks are "relatively strong." <u>Dieter</u>, 880 F.2d at 329. However, the Eleventh Circuit affirmed without opinion a ruling from the Middle District of Florida that clarified that incontestable status "does not mean that a mark's strength cannot be attacked." <u>HBP, Inc. v. American Marine Holdings, Inc.</u>, 290 F. Supp. 2d 1320, 1329 (M.D. Fla. 2003), <u>aff'd</u>, 129 Fed. Appx. 601 (11th Cir. 2005). Instead, the court described incontestability as "simply one piece of the overall determination of a mark's strength." <u>Id.</u> Accordingly, the court will begin the strength analysis with the presumption that Oregon's incontestible mark is relatively strong, but will consider whether other factors negate this presumption.

### (2) <u>Third-Party Use</u>

"[I]mportant in gauging the strength of the mark is the degree to which third parties make use of the mark." <u>Frehling</u>, 192 F.3d at 1336. "The less that third parties use the mark, the stronger

it is, and the more protection it deserves." Id. A consideration
relevant in determining the significance of third-party use of a
mark is the entire name a third-party uses, as well as the kind of
business in which the user is engaged. Safeway Stores, Inc., 675
F.2d at 1165 ("Third-party users that incorporate the word Safeway
along with distinctive additional words, or engage in a business
different from that of Safeway Stores, may not diminish the
strength of the Safeway mark."); Board of Regents of the University
System of Georgia v. Buzas Baseball, Inc., 176 F. Supp. 2d 1338,
1351 (N.D. Ga. 2001) ("Third party users that incorporate the word
"Buzz" or a bee-like design with distinctive additional words, or
are engaged in distinctly different businesses, may not
significantly diminish the strength of the mark."). "Use of the
same or similar marks by third parties in unrelated businesses does
not diminish the distinctiveness of a mark in a particular field."
Gold Kist, Inc. v. Conagra, Inc., 708 F. Supp. 1291, 1298 (N.D. Ga.
1989). Thus, "unauthorized use of a mark does not necessarily
render a mark weak. The proper inquiry is whether the third party
use *significantly* diminishes the public's perception that the mark
identifies services connected with the owner." Breakers of Palm
Beach, Inc., v. International Beach Hotel Development, Inc., 824 F.
Supp. 1576, 1583 (S.D. Fla. 1993) (finding that twelve uses within
the state of Florida of "the Breakers" as part of properties'

business names did not diminish the plaintiff's trademark "The Breakers"). "The significance of third party use is evaluated based on the entire name and symbol, the type of business in which it is used, and geographic location." Id.

In this case, Trilink argues that Oregon's mark is weak because the three-letter "PRO" combination in the PRO-LITE trademark has been registered 40 times. Four of these trademarks, Poulan PRO, PRO MAC, Pro-Series, and PRO-TEC TIP, are used in relation to chain saws and saw chain, and thirteen of these registered marks are in use for other types of handheld saws and saw blade. These trademarks include: Quantum Pro, All Pro, KCPROAM, Dualpro, Ampro, Professional Woodworker, Durapro, Slimpro, Lapro, Jack-Pro, Pro'Skit, Steel-Pro, and Protool.

The court is not persuaded that use of the "PRO" combination in other registered marks, even in marks used within the saw chain industry, significantly diminishes the PRO-LITE mark. As noted above, the significance of third-party use is evaluated based on the entire name and symbol. Here, none of the other marks incorporate the entire "PRO-LITE" name. Moreover, there is no indication that these other marks are displayed in a format or in conjunction with symbols confusingly similar to Oregon's use and display of the PRO-LITE mark. In addition, the fact that four other entities in the saw chain industry use "PRO" in their product

names does not necessarily constitute the "extensive third-party use" needed to diminish the plaintiff's mark.  <u>See</u> <u>Breakers</u>, 824 F. Supp. at 1583 (finding that extensive third-party use required more than 12 unauthorized uses).  Accordingly, the court finds that the PRO-LITE mark is relatively strong, even when third-party use of the "PRO" combination is considered.

### (3) **Extent of Use of Mark**

The third measure of a mark's strength is the extent of its use, as gauged by the duration of its use and the amount of advertising and promotion done under the mark.  The theory behind this criterion is that the more that a mark has been promoted and the longer that it has been in use, the stronger the mark is likely to be.  <u>Gold Kist, Inc.</u>, 708 F. Supp. at 1297.

Oregon has provided evidence that it and its predecessors-in-interest have used the PRO-LITE mark in connection with chain saws and saw chain since 1981.[7]  In addition, Oregon has provided evidence that it has expended significant resources advertising its products under the PRO-LITE mark.  Moreover, Oregon claims that it

---

[7]     In support of this fact, Oregon points the court to a copy of the PRO-LITE registration in the Principal Register.  "A registration in the Principal Register provides prima facie evidence of, inter alia, the registrant's ownership and exclusive right to use the marks . . . as well as proof of the continual use of the marks dating back to the filing date of the applications for registration."  <u>Victoria's Cyber Secret v. V Secret Catalogue, Inc.</u>, 161 F. Supp. 2d 1339, 1349 (S.D. Fla. 2001).

has sold millions of dollars of products in the United States under the PRO-LITE mark.  This evidence is indicative of strength.

Nevertheless, Trilink argues that Oregon's mark is weak.  In support of this argument, Trilink contends that Oregon only promotes its products in its catalogues, at trade shows, and on Oregon's web sites.  Moreover, it contends that recognition of the trade name "Oregon," is low; thus, consumer recognition of the PRO-LITE mark must, by inference, also be low.

The court finds Trilink's argument regarding the strength of the Oregon mark less than compelling.  To determine that the Oregon brand had low consumer recognition, Trilink relied on a consumer survey.  This survey did not test or even mention the PRO-LITE mark.  The court concludes that it is an impermissible leap to infer that the PRO-LITE mark does not enjoy consumer recognition because only 21% percent of survey respondents recognized its parent brand.

On the other hand, the court concludes that the strength of the PRO-LITE mark is undermined by the fact that it has not been widely advertised.  See Current Communications Group, LLC v. Current Media, LLC, No. 1:05-CV-385, 2005 U.S. Dist. LEXIS 40733, at *7-8 (S.D. Ohio Aug. 2, 2005) ("Even though Plaintiff's marks are presumptively strong, their strength is undermined by the fact that Plaintiff has not widely advertised them.").  Though Oregon

may have spent substantial resources advertising the PRO-LITE mark, its relatively narrow advertising campaign does not lend PRO-LITE the strength that it might have if advertised in a widespread manner.

However, the fact that Oregon did not engage in a widespread advertising campaign is not fatal. Although a less targeted campaign would undoubtedly render the PRO-LITE mark stronger, the court cannot conclude that the mark is weak because Oregon failed to undertake such efforts.[8] Thus, the court concludes that Oregon's mark is relatively strong and entitled to protection.

### b. <u>The Similarity of the Marks</u>

The next factor to consider in evaluating the likelihood of confusion between a set of trademarks is the degree to which they are similar. In undertaking such an evaluation,

> the court compares the marks at issue and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." [T]he more similar the marks are in their sound, appearance, and manner, the more likely it is that a reasonable consumer will be confused as to the source of the product that each mark represents.

<u>Board of Regents</u>, 176 F. Supp. 2d at 1352 (citing <u>Frehling</u>, 192 F.3d at 1337). As a general rule, "where the goods and services

---

[8]    In addition, the court cannot adopt Trilink's argument that Oregon's mark is weak simply because Oregon failed to conduct consumer surveys gauging public recognition of the mark.

are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products." <u>SunAmerica Corp. v. Sun Life Assurance Co. of Canada</u>, 890 F. Supp. 1559, 1575 (N.D. Ga. 1994) (citation omitted) (finding that the marks Sun Life of America and Sun Life (U.S.) were indistinguishable and that the marks Sun Life of America and Sun Life of Canada were closely similar).

In this case, Oregon and Trilink's goods are directly competitive and thus require a lower degree of similarity to prove a likelihood of confusion. The two marks differ by only one letter – Oregon's PRO-LITE mark includes a "t" and Trilink's PROLINE mark includes an "n".[9] Thus, they sound similar and look similar. In addition, the marks are used in a similar manner in that they are both used in marketing to denote chain saw accessories.

While the products are indisputably similar in key ways, the confusion that their similarity might otherwise cause a consumer is diminished by the manner in which the marks are portrayed. The evidence shows that the PRO-LITE mark is generally found

---

[9]    PRO-LITE also contains a hyphen that PROLINE does not. However, other courts have noted that the use of a hyphen is too minor a difference to be classified as significant. <u>See</u>, <u>e.g.</u>, <u>Stern's Miracle-Gro Products, Inc. v. Shark Products, Inc.</u>, 823 F. Supp. 1077, 1086 (S.D.N.Y. 1993).

immediately following the word OREGON as part of a design featuring pine trees and a mountain, as follows:



The PROLINE mark, on the other hand, appeared[10] in large block letters with no design. [Doc. No. 149, Attachment 3, Ex. A]. Moreover, the font used for the PROLINE mark does not match the PRO-LITE font.

Courts in this circuit have repeatedly found that marks otherwise confusingly similar in the abstract are rendered distinct by their presentation. See, e.g., HBP, Inc., 290 F. Supp. 3d at 1332-33 (finding that marks encompassing the term "Daytona" were not similar in light of their presentation); Corbitt Manufacturing Co. v. GSO America, Inc., 197 F. Supp. 2d 1368, 1377 (S.D. Ga.

_____

[10] The PROLINE mark is no longer in use and was not available to paste into this order.

2002)(finding that a party failed to show likelihood of confusion, in part, because the "marked differences in the parties' packaging . . . create an overall impression of distinct manufacturers."); <u>Tommy Hilfiger Licensing, Inc. v. Goody's Family Clothing</u>, No. 1:00-cv-1934-BBM, 2003 U.S. Dist. LEXIS 8788, at *87 (N.D. Ga. May 9, 2003) (finding that the dissimilarities between packaging affected the similarity of the parties' marks). Thus, similar marks placed on directly competitive goods may not result in confusion where the appearance and usage of the marks is dissimilar. <u>HBP, Inc.</u>, 290 F. Supp. 3d at 1332. This is particularly true where one of the noticeably different marks is always or almost always presented in association with its company name. <u>See</u> <u>Vitarroz Corp. v. Borden, Inc.</u>, 644 F.2d 960, 969 (6th Cir. 1982) ("When similar marks are always presented in association with company names, the likelihood of confusion is reduced.").

Such is the case here. Although the PROLINE and PRO-LITE marks share undeniable similarities, when compared as they appear in the marketplace, they are markedly different. <u>See</u> <u>Munters Corp. v. Matsui America, Inc.</u>, 730 F. Supp. 790, 795 (N.D. Ill. 1989) (citations omitted) ("In considering the similarities and differences between marks, the marks in their entireties must be compared in light of what occurs in the marketplace, not the courtroom. . . . Prominent display of different names on the marks

reduces the likelihood of confusion even where the marks are otherwise similar."). The PRO-LITE mark is consistently depicted along with the Oregon mark, making confusion between the PROLINE and PRO-LITE marks less likely than it might otherwise be. Indeed, even the PTO did not cite the PRO-LITE trademark against Trilink when Trilink sought to register its PROLINE mark.

Because the portrayal of the PROLINE and PRO-LITE marks is so different, the court cannot conclude that the marks are confusingly similar. This factor cuts in favor of Trilink.

### c.   The Similarity of the Parties' Products and Services

The third factor that the court must consider in the likelihood of confusion analysis is the similarity between Trilink and Oregon's products. "This factor requires a determination as to whether the products are the kind that the public attributes to a single source." Frehling, 192 F.3d at 1338. "The issue is not whether the purchasing public can readily distinguish between the products of the respective parties, but rather whether the products are so related in the minds of consumers that they get the sense that a single producer is likely to produce both." Western Union Holdings, Inc. v. Eastern Union Inc., No. 1:06-cv-01408, 2007 U.S. Dist. LEXIS 66281, at *23 (N.D. Ga. Sept. 7, 2007) (citing Frehling, 192 F.3d at 1338).

In this case, Oregon uses its mark on guide bars for chain saws.  When in use, Trilink used its mark on chain saw parts and accessories, namely saw chain, guide bars, sprockets, files, file guides, and blades.  There can be no dispute that the parties used their marks on similar, and sometimes identical, products; indeed, Trilink does not even argue this point.  Accordingly, this factor cuts strongly in favor of Oregon.

### d.  The Similarity of the Parties' Retail Outlets and Customers

The fourth factor "takes into consideration where, how, and to whom the parties' products are sold." <u>Western Union Holdings</u>, 2007 U.S. Dist. LEXIS 66281, at *26 (citing <u>Frehling</u>, 192 F.3d at 1339). Although "the parties' outlets and customer bases need not be identical" to support a likelihood of confusion, "some degree of overlap should be present."  <u>Frehling</u>, 192 F.3d at 1339.

As noted at the outset, Trilink and Oregon are competitors in a relatively small industry.  They generally sell their products to the same outlets: namely, large retailers and original equipment manufacturers.  In fact, Oregon and Trilink both attended the same line review on at least one occasion.  For purposes of this motion, Trilink does not even attempt to argue that its retail outlets and customers are dissimilar from Oregon's.  Accordingly, this factor weighs in favor of Oregon.

### e.   <u>The Similarity of Advertising Media Used</u>

The "similarity of advertising" factor focuses on the methods the companies use to advertise their products, "not necessarily on the precise newspapers or magazines which are used." <u>Gold Kist</u>, 708 F. Supp. at 1301. "The greater the similarity in the campaigns, the greater the likelihood of confusion." <u>Ross Bicycles, Inc. v. Cycles USA, Inc.</u>, 765 F.2d 1502, 1508 (11th Cir. 1985).

Oregon has presented evidence that both parties advertise(d) their respective marks through similar channels of media, such as through web sites[11] and trade shows. Trilink has not presented any evidence pointing to dissimilarities in the parties' marketing strategies or even argued that they were dissimilar; accordingly, the court will construe this factor in favor of Oregon.

### f.   <u>The Existence of Actual Confusion</u>

"It is undisputed that evidence of actual confusion is the best evidence of likelihood of confusion." <u>Frehling</u>, 192 F.3d at 1340 (citing <u>John H. Harland Co.</u>, 711 F.2d at 978). "However,

---

[11]    In its statement of additional facts, Oregon states that Trilink maintained, operated, and advertised products on a website found at http://www.prolinesawchain.com. Trilink contends that Oregon's evidence does not stand for the proposition that Trilink advertised its PROLINE mark on that web page. The court is unpersuaded by Trilink's hypertechnical objection, as the very name of the website references the PROLINE mark.

such evidence is not a prerequisite, and thus it is up to individual courts to assess this factor in light of the particular facts of each case." Id. (citing Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 263 (5th Cir. 1980)).

Oregon has conceded that it has no evidence of actual confusion and has also stated that this factor weighs in Trilink's favor. Though important, the absence of actual confusion is not dispositive of the issue of likelihood of confusion; thus, the court will return to this issue when balancing the seven factors.

### g. **Trilink's Intent**

The last factor that the court must consider in the likelihood of confusion analysis is whether Trilink acted in bad faith in using the PROLINE mark. To prove that Trilink acted in bad faith, Oregon must show that Trilink adopted the PROLINE mark with the intention of deriving a benefit from Oregon's business reputation or that Trilink was intentionally blind to confusion between the parties' marks. Frehling, 192 F.3d at 1340 (citing John H. Harland Co., 711 F.2d at 799); Board of Regents, 176 F. Supp. 2d at 1353. Trilink argues that Oregon cannot meet this burden, and presents evidence demonstrating that Trilink was unaware of Oregon's PRO-LITE mark when it adopted the PROLINE mark, that it chose the PROLINE mark because of its versatility in describing Trilink's products other than saw chain, that it engaged in online trademark

searches, that it engaged counsel to file on the mark, that Oregon's mark was not raised as an issue in the pre-filing procedures, that Trilink submitted its mark for registration, and that the PTO examiner did not identify Oregon's mark as confusingly similar to the PROLITE mark. In addition, Trilink has presented evidence that it stopped using the PROLINE mark and elected not to pursue registration of it after it learned of Oregon's opposition.

Oregon admits that it has no direct evidence that Trilink acted in bad faith; however, it argues that Trilink may have conducted a deficient trademark search and therefore may have been intentionally blind to possible confusion between the PROLINE and PRO-LITE marks. In addition, Oregon argues that this dispute, coupled with two other, similar disputes that the parties have had indicates Trilink's general disregard for Oregon's intellectual property rights.

The court finds Oregon's arguments unavailing. First, Oregon's evidence of other disputes between the parties regarding intellectual property rights proves nothing other than the litigious nature of the parties' relationship and is irrelevant to the case at hand. Thus, it does not support an allegation of bad faith in this case.[12]

_____

[12] In each of these disputes, Oregon accused Trilink of infringing on its intellectual property rights. Oregon notes that, in each case, Trilink voluntarily discontinued the allegedly

-41-

Second, Oregon's speculation that Trilink conducted deficient trademark clearance procedures does not provide a reasonable jury with a basis to find in favor of Oregon on this issue. Oregon's argument that Trilink was willfully blind is based on Trilink's failure to produce documents or identify documents in its privilege log related to trademark clearance procedures, Trilink's alleged failure to conduct a reasonable trademark search for the PROLINE mark in regard to lawn equipment,[13] and the following excerpt of Trilink's president's deposition testimony:

> Q: Were there any clearance activities undertaken to approve [the PROLINE] mark prior to Trilink's adoption of it?

---

infringing activities shortly after Oregon notified Trilink of the alleged violation, implying that Trilink's behavior is the equivalent of an admission that it was acting improperly. To the extent that this is the purpose of this evidence, it is excluded under Federal Rule of Evidence 407, which bars subsequent remedial measures. See GMC v. Keystone Automotive Industries, Inc., 453 F.3d 351, 357 n.1 (6th Cir. 2006) (finding that the district court properly excluded evidence that the defendant modified its product to remove the disputed trademark as inadmissible evidence of subsequent remedial measures).

[13]    In Trademark Application Serial No. 78/689,597, Trilink sought to register the PROLINE mark for use with power-operated lawn mowers, power-operated string trimmers, power-operated hedge trimmers, and replacement parts for this equipment. Trilink abandoned this application after receiving a PTO office action citing the registration for nearly identical marks for highly related products. Oregon contends that this is "telling of Trilink's level of care employed prior to its adoption of the PROLINE mark at issue here." Oregon's Resp. Br., p. 17 [Doc. No. 184].

A:   We always, when we apply for a trademark or –
     or any of that kind of thing, do a  - -  I
     think it's test, search online, and then we
     sent it to our trademark attorneys, Kilpatrick
     Stockton, here in Atlanta, for them to file on
     the - - on the mark.

Q:   And did Kilpatrick do any independent testing
     or - -  strike that question.  Did Kilpatrick
     Stockton undertake any additional clearance
     procedures, other than those that Trilink had
     conducted?

A:   I would not be - -  I don't know.  I don't
     know.

Q:   Did you request - -

A:   I didn't do the request.  I would certainly
     have thought so, but like I said, I did not do
     the request, so I'm not sure.

Lacy Dep. 162:25-163:18 [Doc No. 174].

Oregon's evidence is not sufficient to permit a finding of
willful blindness.  First, the testimony of Trilink's president
does not prove that Trilink did not perform satisfactory trademark
clearance searches; instead, it simply establishes that Trilink
performed some trademark searches before turning the matter over to
their attorneys, who may or may not have undertaken additional
seraches.  Similarly, the bare assertion that Trilink did not
produce any documents related to clearance searches establishes
nothing absent accompanying evidence that Oregon asked Trilink for
such documents.  Finally, the evidence that the PTO cited
trademarks against Trilink's PROLINE mark in regard to lawn

-43-

equipment application is irrelevant as to whether Trilink conducted adequate searches for its PROLINE mark in regard to chain saw accessories.

In short, Oregon has failed to demonstrate any evidence that Trilink was willfully blind or otherwise acted in bad faith; instead, it merely offers unsupported speculation. The court concludes that no reasonable jury could find that Trilink acted in bad faith on the basis of such speculation; accordingly, this factor cuts in favor of Trilink.

**h.** **Balancing the Seven Factors in the Likelihood of Confusion Analysis**

The Eleventh Circuit has recently discussed how the seven factors discussed above should be weighed, and has noted that it "entails more than the mechanistic summation of the number of factors on each side." Custom Manufacturing and Engineering, Inc. v. Midway Services, 508 F.3d 641, 649 (11th Cir. 2007).

> These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case. . . . The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.

Id. at 650 (internal citations omitted).

In this case, the above analysis demonstrates that Oregon's mark is relatively strong. Moreover, it indicates that the PROLINE and PRO-LITE marks are used in relation to similar products, are marketed through the same advertising mediums to similar customers, and, indeed, are in competition. All of these factors cut in favor of Oregon.

On the other hand, the court notes that Oregon has no evidence that anyone has actually been confused by the two marks, and notes that Trilink did not engage in bad faith when picking the mark. Moreover, the court notes that despite the similarity of the marks in the abstract, they are strikingly dissimilar when they appear in the manner in which they are/were marketed.

When all of the circumstances of this case are considered, the court concludes that the competing trademarks are not likely to cause confusion among consumers in the marketplace. As discussed above, the marks are not similar to the point of confusion, and the court cannot conclude, without evidence of actual confusion, that they are likely to lead to consumer confusion. Accordingly, summary judgment is granted in favor of Trilink on Oregon's claim for trademark infringement.

### 2. Oregon's Claim of Unfair Competition under 15 U.S.C. § 1125(a)(1)

Oregon asserts a claim for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1). This section "forbids unfair trade practices involving infringement of trade dress, service marks, or trademarks, even in the absence of federal trademark registration." Planetary Motion, Inc., 261 F.3d at 1193 (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992)). To prevail under this section, Oregon must show "(1) that it had prior rights in the mark at issue; and (2) that [Trilink] had adopted a mark or name that was the same, or confusingly similar to [Oregon's] mark, such that consumers were likely to confuse the two." Id. (citations omitted).

The parties agree that the seven factors used to determine whether likelihood of confusion exists for a trademark infringement claim are also used to determine whether there is likelihood of confusion for a Lanham Act unfair competition claim. Fila U.S.A. v. Kim, 884 F. Supp. 491, 495 (S.D. Fla. 1995) ("Courts apply the same test of likelihood of confusion in determining violations of 15 U.S.C. § 1125(a)(1) as in determining whether there has been trademark infringement in contravention of 15 U.S.C. § 1114.") (citing Ross Bicycles, Inc., 765 F.2d at 1503-04). Because Oregon relies on the same facts for both claims, the finding that there is

no likelihood of confusion for purposes of trademark infringement is determinative here. Accordingly, Trilink is entitled to summary judgment on Oregon's claim for federal unfair competition.

### 3. Oregon's Claim of Unfair Competition under O.C.G.A. § 10-1-393 et seq.

Trilink has moved for summary judgment on Oregon's claim for unfair competition under O.C.G.A. § 10-1-393 et seq. Oregon has admitted that it has no cause of action under this section. Accordingly, the court grants Trilink's motion for summary judgment in regard to this claim.

### 4. Summary of Trilink's Motion for Summary Judgment

As described in detail above, Trilink is entitled to summary judgment on all of Oregon's counterclaims. No further consideration of these issues is warranted.

### C. Oregon's Motion for Partial Summary Judgment [Doc. No. 157]

Oregon has moved for partial summary judgment in relation to Trilink's request for monetary damages. Oregon claims that Trilink has failed to present sufficient evidence that it has suffered any injury as a result of Oregon's alleged false advertising; accordingly, it claims that Trilink cannot succeed on a claim for actual damages. For the same reason, Oregon also contends that

Trilink cannot succeed on its claim for tortious interference with business relations.  Thus, Oregon seeks summary judgment on this claim in its entirety.

### 1.  Trilink's Claims for Monetary Relief

Trilink has articulated that it seeks two types of monetary damages: (1) actual damages, consisting of its expert's estimates of lost sales and its costs to develop testing to counter Oregon's marketing materials; and (2) Oregon's profits from customers who received the advertisements.  Trilink's Resp. Br., p. 17 [Doc. No. 194].  The court will address Trilink's entitlement to each of these types of damages.

### a.  Actual Damages

A party seeking monetary damages for false advertising in violation of 15 U.S.C. § 1125(a) of the Lanham Act must establish that it has been injured by the false advertising.  See Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Avenue, 284 F.3d 302, 311 (1st Cir. 2002) ("[W]hereas a showing that the defendant's activities are likely to cause confusion or to deceive customers is sufficient to warrant injunctive relief, a plaintiff seeking damages must show actual harm to its business."); KEG Technologies, Inc. v. Laimer, 436 F. Supp. 2d 1364, 1372 (N.D. Ga. 2006) (noting that a plaintiff seeking monetary damages for a violation of 15 U.S.C. § 1125(a) must meet a higher standard of proof than a

plaintiff seeking an injunction); Practice Perfect, Inc. v. Hamilton County Pharmaceutical Association, 732 F. Supp. 798, 804 (S.D. Ohio 1989) ("Section 43(a) was not intended to provide a windfall for plaintiffs, and therefore the plaintiff must show that it sustained actual harm to its business as a result of the defendant's misrepresentations."). To make this showing, the plaintiff must demonstrate that the false advertisement actually deceived or misled consumers, which in turn caused injury to the plaintiff. See Cashmere, 284 F.3d at 311 n.9; United Industries Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998) ("[T]o recover money damages under the Act, a plaintiff must prove both actual damages and a causal link between the defendant's violation and those damages."). "A precise showing [of harm] is not required, and a diversion of sales, for example, would suffice." Clorox Co. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 33 (1st Cir. 2000) (citations omitted); PPX Enterprises, 818 F.2d at 272 (citations omitted) ("Although the quantum of damages, as distinguished from entitlement, must be demonstrated with specificity, . . . courts may engage in some degree of speculation in computing the amount of damages. . . ."). However, "the court must ensure that the record adequately supports all items of damages claimed and establishes a causal link between the damages and the defendant's conduct, lest the award become speculative or

violate [Lanham Act] section 35(a)'s prohibition against punishment." Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1336 (8th Cir. 1997).

Courts have noted that "marketplace damages and actual confusion are notoriously difficult and expensive to prove." Balance Dynamics Corp. v. Schmitt Industries, 204 F.3d 683, 692 (6th Cir. 2000) (citing PPX Enterprises, Inc., 818 F.2d at 272-73 and U-Haul International Inc. v. Jartran, Inc., 793 F.2d 1034, 1041 (9th Cir. 1986)). Thus, many courts - including the Eleventh Circuit - routinely presume that literally false advertising actually deceives consumers. See, e.g., Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002) ("[O]nce a court deems an advertisement to be literally false, the movant need not present evidence of consumer deception."); Cashmere, 284 F.3d at 314 ("[A]pplying a presumption of consumer deception to all literal falsity claims, irrespective of the type of relief sought, makes sense. . . . Common sense and practical experience tell us that we can presume, without reservation, that consumers have been deceived when a defendant has explicitly misrepresented a fact that relates to an inherent quality or characteristic of the article sold."). Moreover, a growing number of courts have also adopted a presumption, in cases where money damages are sought, that willfully deceptive,

comparative advertisements cause financial injury to the party whose product the advertisement targets.  See <u>Porous Media Corp.</u>, 110 F.3d at 1336 (8th Cir. 1997); <u>Heidi Ott A.G. v. Target Corp.</u>, 153 F. Supp. 2d 1055, 1072 (D. Minn. 2001) ("[A] presumption of causation and injury sufficient to entitle the plaintiff to damages will arise if the defendant deliberately engaged in deceptive comparative advertising."); <u>Iams Co. v. Nutro Products</u>, No. 3:00-cv-566, 2004 U.S. Dist. LEXIS 15134, at *14 (S.D. Ohio July 3, 2004) (noting that the "assumed literal falsity of the statements in issue give rise to a presumption of actual deception" and "[i]n instances of comparative advertising, where the competitor's products are specifically targeted, a plaintiff is also entitled to a presumption of money damages.").

To date, the Eleventh Circuit has not considered whether to adopt a presumption of causation and financial harm when the defendant deliberately engages in deceptive, comparative advertising.  However, it has indicated - in the context of a preliminary injunction - that it will presume "irreparable harm" when a false, comparative statement is made.  <u>North American Medical Corp.</u>, 522 F.3d at 1227.  This court is persuaded by this opinion and the case law discussed above, and concludes that a presumption of causation and harm should apply to claims for actual damages when a defendant disseminates willfully deceptive,

comparative advertising.  Such a presumption forces the willful fabricator – rather than its intended victim – to bear the burden of demonstrating that its deliberate misrepresentations did not result in harm to its competitor.  Thus, it discourages companies from engaging in deliberately deceptive advertising campaigns, protecting consumers and competitors alike.

In its response brief, Trilink alleges, and Oregon does not refute,[14] that Oregon engaged in deliberate, literally false, material advertising that directly compared Trilink's chain to Oregon's chain.  Thus, under the standards discussed above, Trilink is entitled to a presumption that Oregon's advertising has deceived its customers, which consequently caused Trilink financial injury.

This presumption is not necessarily the end of the analysis. To the contrary, Oregon may rebut it with evidence that Trilink did not suffer its alleged marketplace injuries.  In its brief, Oregon has made some arguments that could be used to meet this burden. However, in regard to many companies from which Trilink alleges lost sales, Oregon simply relies on Trilink's inability to demonstrate causation and injury and thus fails to meet its burden of rebuttal.  Accordingly, Oregon fails to demonstrate that its advertisements did not cause financial injury to Trilink in the

---

[14]    The court notes that Oregon does not refute Trilink's allegations for purposes of this motion only.

-52-

form of lost sales and thus fails to demonstrate its entitlement to summary judgment on this ground.[15]

Moreover, Oregon has failed to demonstrate its entitlement to summary judgment in regard to Trilink's claim for "damage control costs." Trilink seeks these costs as reimbursement for product testing expenses that it allegedly incurred from Applied Technical Services, Inc. ("ATS") to rebut the statements made in Oregon's marketing materials. Oregon contests this claim, arguing that "[t]hese costs are irrelevant to any alleged injury, as Trilink previously admitted that '[it] has engaged ATS on a regular basis to test saw chain' and that the 'ATS testing is a part of Trilink's regularly conducted business.'" Reply Br., p. 14 [Doc. No. 208].

---

[15]    As Oregon points out, Trilink will bear the burden at trial of demonstrating not only entitlement to damages, but also the quantum of those damages. Pharmanetics, Inc. v. Aventis Pharmaceuticals, Inc., 182 Fed. Appx. 267, 274 (4th Cir. 2006) ("Assuming that a presumed-damages standard would apply to this Lanham Act claim, damages are presumed only as to causation; the extent of money damages is a separate matter that must have evidentiary support."); Porous Media Corp., 110 F.3d at 1336 ("Once it had established its claim, Porous still bore the burden of proving an evidentiary basis to justify any monetary recovery."). However, this does not mean, as Oregon suggests, that Trilink must present further evidence of causation; instead, it means that Trilink must come forward with some evidence of the harm's financial extent. See Pharmanetics, Inc., 182 Fed. Appx. at 274 ("Thus, a Lanham Act plaintiff may not have to prove harm through, for example, consumer surveys, but that plaintiff must still prove the harm's financial extent."). For practical purposes, this means that Trilink must, at trial, provide some evidence from which its damages can be calculated before an award will be authorized.

The court has reviewed the evidence cited by Oregon, and finds it unavailing to support a motion for summary judgment. Although Trilink does, in the motion, claim that it retained ATS on a regular basis and not in anticipation of litigation, it went on to state that "[t]he purpose of commissioning ATS was to test saw chain under normal working conditions in order to verify or refute the claims made by Oregon." Trilink's Resp. to ATS's Motion to Quash, at p. 2 [Doc. No. 73]. Thus, it appears that there is a question of fact regarding whether the ATS testing was conducted in response to the allegedly false advertising; accordingly, Oregon is not entitled to summary judgment in regard to this claim.

### b. **Oregon's Profits**

The court next turns to the propriety of an award in the form of Oregon's profits. "In contrast to actual damages, the award of a defendant's profits is not conditioned upon a showing of actual confusion." KEG Technologies, Inc., 436 F. Supp. 2d at 1373. Rather, an award of a defendant's profits is "appropriate where: (1) the defendant's conduct was willful and deliberate; (2) the defendant was unjustly enriched; or (3) it is necessary to deter future conduct." Optimum Technologies, Inc. v. Home Depot, U.S.A., Inc., 217 Fed. Appx. 899, 902 (11th Cir. 2007).

> In assessing profits[,] the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction

> claimed. . . . If the court shall find that the
> amount of the recovery based on profits is either
> inadequate or excessive the court may in its
> discretion enter judgment for such sum as the court
> shall find to be just, according to the
> circumstances of the case. Such sum . . . shall
> constitute compensation and not a penalty.

Burger King Corp. v. Mason, 855 F.2d 779, 781 (11th Cir. 1988).

As conveyed in Burger King Corp., a plaintiff entitled to profits is not necessarily entitled to all of a defendant's profits; instead, "there should be some connection between harm and recovery so that the award does not contravene the Lanham Act's mandate that any monetary award constitute compensation and not a penalty." KEG Technologies, 436 F. Supp. 2d at 1373. Recently, some courts have interpreted this to mean that the plaintiff must demonstrate that the defendant has benefited from the false advertisements. See Tao of Systems Integration, Inc. v. Analytical Services & Materials, Inc., 330 F. Supp. 2d 668, 672 (E.D. Va. 2004) (noting that a determination of whether a party receives the defendant's profits turns on whether the defendant has benefitted from his false advertisements); Logan v. Burgers Ozark Country Cured Hams, Inc., 263 F.3d 447, 464-65 (5th Cir. 2001) ("[W]here a plaintiff who has brought a Lanham Act claim for false advertising has failed to present evidence that the defendant benefitted from the alleged false advertising, the plaintiff will not be permitted to recover any of the defendant's profits under 15 U.S.C.

§ 1117(a)."); <u>Balance Dynamics Corp. v. Schmitt Industries</u>, 204
F.3d 683, 695 (6th Cir. 2000) (noting that the plaintiff was only
entitled to a disgorgement of profits "if it could show that
defendant gained additional sales due to the advertisement, or that
plaintiff lost sales, or was forced to see [sic] its product at a
lower price.").

The Eleventh Circuit has not yet considered whether the
plaintiff in a false advertising case must prove that the false
advertising is beneficial to the defendant before it is eligible
for an award of the defendant's profits.  However, Eleventh Circuit
decisions in regard to trademark infringement have consistently
concluded that once the plaintiff produces evidence regarding the
defendant's gross sales, the burden is on the defendant-wrongdoer
to demonstrate that its profits are not due to its Lanham Act
violation rather than vice-versa.  <u>See</u>, <u>e.g.</u>, <u>Burger King Corp.</u>,
855 F.2d at 781; <u>Wesco Manufacturing, Inc. v. Tropical Attractions</u>
<u>of Palm Beach, Inc.</u>, 833 F.2d 1484, 1488 (11th Cir. 1987) (noting
that after the plaintiff proves the defendant's sales, "[t]he
burden then shifts to the defendant, which must prove its expenses
and other deductions from gross sales."); <u>Nutrivida, Inc. v.</u>
<u>Inmuno Vital, Inc.</u>, 46 F. Supp. 2d 1310, 1316 (S.D. Fla. 1998)
("The Lanham Act thus squarely places the burden of proof on the
infringer to establish any deductions from its gross sales in order

to arrive at the correct profit figure. Moreover, under the Lanham Act and the common law, it is the infringer's burden to prove any proportion of its total profits which may not have been due to the infringement."). Under this framework, "[a]ny doubts about the actual amount of gross sales or profits will be resolved against the infringing party." Nutrivida, Inc., 46 F. Supp. 2d at 1316 (citing J. Thomas McCarthy, Trademarks and Unfair Competition § 30:66 (4th ed. 1998)).

While the court will not speak to all false advertising cases, it concludes that where a competitor specifically disparages a market newcomer through deliberately false advertisements, it will not require that newcomer to prove that the advertisements benefitted the disseminator before awarding an accounting of profits.[16] So long as the newcomer can provide evidence of the infringer's gross sales, the newcomer will be eligible for an award of profits at the court's discretion.

As noted above, Trilink has presented unrefuted evidence that Oregon engaged in deliberate, literally false, material advertising that directly compared Trilink's chain to Oregon's chain. Moreover, Trilink has produced evidence of Oregon's sales.

---

[16] As a practical matter, the benefit that a veteran business seeks to achieve when disparaging a market newcomer is maintenance of its previous customers. Thus, it could be almost impossible for a newcomer to "prove" that the veteran has been benefitted by the advertisements.

Accordingly, Trilink has presented evidence sufficient to sustain an award of Oregon's profits. Oregon is not entitled to summary judgment in this regard.

## 2. **Trilink's Tortious Interference Claim**

To succeed on a claim for tortious interference with business relations under Georgia law, the plaintiff must establish: (1) that the defendant acted improperly without privilege; (2) that the defendant acted purposefully, with malice, and with intent to injure; (3) that the defendant's actions induced a third-party or parties not to enter into or continue a business relationship with the plaintiff; (4) that the plaintiff has suffered some financial injury; and (5) that the defendant is a stranger to the business relationship at issue. Servicetrends, Inc. v. Siemens Medical Systems, Inc., 870 F. Supp. 1042, 1068 (N.D. Ga. 1994); J. Kinson Cook of Georgia, Inc. v. Heery/Mitchell, 644 S.E.2d 440, 446 (Ga. Ct. App. 2007).

Oregon contends that it is entitled to summary judgment on Trilink's tortious interference claim because Trilink has failed to prove that Oregon caused a third-party to refrain from entering into or continuing a business relationship with Trilink. In addition, Oregon argues that it is entitled to summary judgment because Trilink has failed to prove any actual injury as a result of Oregon's alleged tortious interference.

In this case, the court need not even address Oregon's actual injury argument because Trilink has failed to demonstrate that Oregon induced a third-party not to enter into or continue a business relationship with Trilink. To meet this burden, Trilink needed to present evidence sufficient to demonstrate that, absent Oregon's marketing materials, business relationships "were reasonably likely to develop in fact." Hayes v. Irwin, 541 F. Supp. 397, 429 (N.D. Ga. 1982). Georgia courts have held that this requires more than circumstantial evidence; instead, the plaintiff must present direct evidence that the relationships were likely to develop absent the interference. See, e.g., American Southern Insurance Group, Inc. v. Goldstein, 660 S.E.2d 810, 820 (Ga. Ct. App. 2008) (concluding that the plaintiff failed to prove its tortious interference claim because none of the potential customers who declined to meet with the plaintiff's agent after the alleged interference testified); Galardi v. Steele-Inman, 266 Ga. App. 515, 522 (Ga. Ct. App. 2004) (finding that the appellants were entitled to judgment as a matter of law where the appellee failed to present direct evidence that the appellants' actions caused her to lose potential business); Camp v. Eichelkraut, 539 S.E.2d 588, 596 (Ga. Ct. App. 2000) (finding that the trial court erred in denying the defendant's motion for a directed verdict on the plaintiff's claim for tortious interference where the plaintiffs had adduced no

evidence from any insurer that it would have retained the plaintiff but for the defendant's allegedly defamatory letters).

In an attempt to demonstrate that business relationships were reasonably likely to develop absent Oregon's interference, Trilink points the court to a number of examples. For instance, Trilink alleges that after Oregon provided retailers Menard's, TSC, Lowe's, and Ace Hardware with its materials, all of these companies chose not to purchase from Trilink. Similarly, Trilink alleges that Homelite, an OEM, had performed internal testing that established that Trilink's chain could be used for Homelite's low cost product on October 6, 2006. However, Oregon then provided Homelite with its marketing materials, and two months later, Homelite communicated to Trilink's president its decision not to buy from Trilink. Trilink described this evidence as circumstantial, and noted that "an inference may be drawn [from the evidence] that Homelite refused to buy based, at least in part, on Oregon's False Advertising." Trilink's Resp. Br., p. 21 [Doc. No. 196]. Next, Trilink alleges that after Oregon presented its materials to Orchard Supply Company at a line review that both Trilink and Oregon attended, Trilink lost Orchard's business, even though Orchard's merchandising manager stated that he had never seen such a large price differential in his career as between Oregon and Trilink. At that line review, Orchard asked Trilink whether it had

testing to refute Oregon's marketing materials. Trilink gave Orchard some internal testing that was housed in its president's laptop, but ultimately was not awarded the business. Finally, Trilink refers the court to testimony from its expert, Mark Gallagher, who noted in his deposition that "but for the false advertising, it's likely that Trilink would have gotten some of" the business from these companies. Gallagher Dep. 38:13-20 [Doc. No. 173].

Even assuming for present purposes that all of the above evidence is admissible, the court concludes that it does not constitute direct, probative evidence that any of the vendors were likely to enter into a business relationship with Trilink in the absence of Oregon's marketing materials. Instead, it constitutes circumstantial or worse, speculative,[17] evidence that - at best - only allows the trier of fact to hypothesize as to the likelihood of future business relationships. Unfortunately for Trilink, evidence that only allows the jury to speculate that a business

---

[17] For instance, the testimony of Mark Gallagher that Trilink would have received some of the business from the companies had they not received the marketing materials is completely speculative. When pressed, Gallagher could not say which particular accounts Trilink would have obtained absent the marketing materials, and later in his deposition, he clarified that his belief that the marketing materials caused Oregon to lose business was an assumption. Gallagher Dep. 53: 17-25 [Doc. No. 173]. Accordingly, this testimony does nothing to bolster Trilink's case.

relationship was likely to develop is an insufficient basis for a tortious interference claim. See Camp, 539 S.E.2d at 596 ("An award for tortious interference with prospective business relations cannot be based on speculation that a relationship would develop."); American Southern Insurance Group, 660 S.E.2d at 820 (Ga. Ct. App. 2008) (finding that evidence that individuals failed to meet with a sales agent after another agent stated that she was a liar who worked for a fraudulent company was insufficient to support a tortious interference claim because it would require speculation to conclude that, absent the alleged interference, the individuals were reasonably likely to have entered into a business relationship with the plaintiff through that sales agent.). Accordingly, Trilink has failed to prove a critical element of its tortious interference claim, and Oregon is entitled to summary judgment in this regard.

### 3. Summary of Oregon's Motion for Summary Judgment

As described more fully above, Oregon's motion for summary judgment is granted in part and denied in part. Oregon is entitled to summary judgment on Trilink's tortious interference claim. However, Oregon is not entitled to summary judgment on Trilink's claims for monetary damages.

### III. **Trilink's Motion to Unseal Documents [Doc. No. 210]**

On May 12, 2007, the court entered a confidentiality and protective order submitted jointly by the parties [Doc. No. 29]. The protective order instructed the parties to review their documents prior to production and designate those containing business, competitive, proprietary, or other information of a sensitive nature about the parties (or of another person whose information the parties were under a duty to maintain in confidence) as confidential. Protective Order, ¶ 6 [Doc. No. 29]. Similarly, the order instructed the parties to designate their documents revealing business, competitive, proprietary, trade secret, or other information of a highly sensitive nature about the parties (or of another person whose information the parties were under a duty to maintain in confidence) as restricted confidential. Id. at ¶ 7. Pursuant to the order, all documents designated as confidential or restricted confidential constitute "protected information," which, if filed, must be under seal.

As detailed in the protective order, any documents designated as confidential or restricted confidential can be de-designated or downgraded if: (1) the producing party chooses to downgrade or eliminate the designation; (2) the receiving party requests in

writing that the producing party downgrade or eliminate the designation and the producing party agrees; or (3) the court orders that the designations be downgraded or eliminated.  <u>Id.</u> at ¶ 15.

If a party moves the court to alter the designations on the documents, it must demonstrate that it has negotiated in good faith with its opposing party before it presents the dispute to the court.  <u>Id.</u>  Once the dispute is presented properly to the court, the burden of proving that the information has been properly designated as protected shall be on the party or person who made the original designation.  <u>Id.</u>

Pursuant to the terms of the protective order, the parties have filed many of their briefs and supporting materials under seal.  However, Trilink - championing the public's right of access to judicial records - now moves to unseal all documents associated with the parties' motions for summary judgment and Oregon's motion to exclude Trilink's witness.

Oregon opposes this motion, claiming that certain documents currently filed under seal contain Oregon's highly sensitive information, such as cost information, pricing information, and other trade secrets.  Oregon contends that Trilink did not conduct a good faith negotiation required by the protective order prior to submitting this issue to the court.  Instead, Oregon argues that Trilink's counsel contacted its counsel, demanded de-designation of

the entire summary judgment record, and filed its motion to unseal several hours after Oregon denied the request. Oregon contends that Trilink's failure to conduct good faith negotiations alleviates Oregon from showing that its materials have been properly designated and that they should remain under seal.

After careful consideration, the court concludes that Trilink and Oregon have not negotiated in good faith as required by the protective order. The parties no doubt spent substantial time drafting and agreeing upon the terms of the protective order, and the court will not remove the protections provided thereunder without more significant effort by the parties to reach an agreement on this issue. Accordingly, Trilink's motion is denied, and the parties are ordered to meet and confer regarding de-designating and downgrading the designation of documents. At the conclusion of negotiations, but no later than 20 days from the date of this order, the parties are instructed to submit to the court a list of any documents they cannot reach an agreement about. The court will address this matter further at that point in time.

## IV.  Oregon's Motion for Leave to File a Surreply [Doc. No. 220]

Oregon has petitioned the court for leave to file a surreply to Trilink's motion seeking an immediate scheduling of trial [Doc. No. 216]. Oregon contends that the surreply is necessary to respond to new facts and law raised in Trilink's reply brief.

Leave to file a surreply may be granted when a party raises new issues in a reply. See Webb v. Astrue, 525 F. Supp. 2d 1329, 1334 (N.D. Ga. 2007). Here, new facts were raised, and Trilink has not objected to Oregon's motion. Accordingly, the court grants Oregon's motion and will consider Oregon's surreply in its analysis of Trilink's motion for immediate scheduling of trial.

## V.   Trilink's Motion for Immediate Scheduling of Trial [Doc. No. 216]

On April 4, 2008, Trilink filed a motion for immediate scheduling of trial [Doc. No. 216]. In this motion, Trilink alleges that Oregon recently conducted additional tests and disseminated additional false advertising based on those tests that has caused The Home Depot, Trilink's largest customer, to require additional testing of Trilink's product. Trilink contends that the cost of testing, related expenses, and lost goodwill are actual damages; thus, it requests that the court construe this motion as a supplement to Trilink's response to Oregon's motion for partial summary judgment. In addition, Trilink requests that the court allow it to supplement[18] its complaint to incorporate the new events

---

[18]   Trilink actually requests that the court allow it to amend its complaint. However, because Trilink's proposed amendments concern events that have transpired since the filing of the complaint, the court will construe this as a motion to supplement pursuant to Federal Rule of Civil Procedure 15(d). See Lussier v. Dugger, 904 F.2d 661, 670 (11th Cir. 1990) (noting that the appropriate way to set forth new facts that have occurred since

and allegations and further requests the court to reopen discovery for limited purposes.[19]  Finally, as the name of the motion indicates, Trilink requests that the court set this case for trial at the court's earliest availability on its calendar.

Oregon, in turn, asks that the court deny Trilink's motion in its entirety.  Oregon contends that Trilink has failed to provide any facts or legal authority justifying its request for an expedited trial schedule.  Oregon further contends that Trilink's new, proposed claims arise from different transactions and occurrences (i.e., new advertisements) than the pending claims; accordingly, Oregon states that Trilink should pursue these claims in another case.  In addition, Oregon contends that Trilink's proposed claims are futile because it has suffered no damage or harm as a result of the additional testing required by The Home Depot.  Thus, Oregon argues that the new evidence that Trilink seeks to add provides no basis upon which additional relief may be granted.  Finally, Oregon contends that the proposed claims do nothing to enhance Trilink's position in regard to Oregon's motion for summary judgment because the newly alleged damages relate

the date of the earlier pleading is to file a supplemental pleading).

[19]    Trilink claims that it is not asking the court to reopen discovery, but then notes that it seeks additional production of documents and depositions.  Accordingly, the court construes this as a request to reopen discovery for limited purposes.

solely to the new advertisement, which is entirely distinct from the claims addressed in Oregon's summary judgment motion. Moreover, Oregon contends that Trilink has once again failed to establish a causal connection between Oregon's alleged conduct and Trilink's alleged injury, and has failed to show that it has actually suffered injury as a result of the new advertisement. If the court does allow Trilink to supplement its complaint, Oregon seeks to schedule a supplemental discovery period and summary judgment briefing schedule to allow the parties an opportunity to address the new issues presented by Trilink's new false advertising claim.

**A.** **Motion to Supplement Complaint and Request for Additional Discovery**

The court first turns to Trilink's motion to supplement its amended complaint to add factual allegations regarding Oregon's new marketing statement. These new factual allegations, set forth in footnote 5 of Trilink's motion, are as follows:

> 34a. In or about the summer of 2007 Oregon commissioned testing by SMP. This testing would compare a "life test" between Oregon's and Trilink's saw chain and bars.

> 34b. SMP generated a report from this test, dated January 9, 2008. Oregon prepared a six-page marketing piece premised upon this SMP report. Thereafter, Oregon distributed the SMP report and marketing statement in the marketplace.

34c. The SMP report and marketing statement are literally false or at least misleading and deceptive as the tests themselves are unreliable.

34d. On March 20, 2008 [sic] Oregon and Trilink participated in a "line review at The Home Depot."

34e. The next day, Trilink learned that The Home Depot required product testing in order to further consider buying Trilink saw chain. This testing was to be at Trilink's expense and Trilink was charged $7,000. Later, The Home Depot indicated that it would pay the cost.

[Doc. No. 216, at p. 8]. According to Trilink, Oregon's new advertising material constitutes false advertising, tortious interference with Trilink's business relations, and an unfair trade practice. It has allegedly resulted in actual damages in the form of lost goodwill and damage to Trilink's reputation.[20]

The scheduling order for this case, construed under Federal Rule of Civil Procedure 16(b), prohibits amendments to the pleadings submitted later than thirty days after the joint preliminary report was filed unless the submitting party can demonstrate "good cause" for the delay. See Fed. R. Civ. P. 16(b); Sosa v. Airprint Systems, 133 F.3d 1417, 1418 (11th Cir. 1998).[21]

---

[20] Trilink also alleges that its actual damages include the cost of the testing required by The Home Depot and related expenses, but later clarifies that The Home Depot agreed to pay for the testing. Accordingly, the court will not consider the testing and related expenses as actual damages at this time.

[21] As evidenced by their arguments, both parties construe this deadline as applying to Trilink's motion to supplement.

The court concludes that Trilink has met that burden here. The good cause standard "emphasizes the diligence of the party seeking the amendment." O'Connell v. Hyatt Hotels, 357 F.3d 152, 155 (1st Cir. 2004); Postell v. Green County Hospital Authority, No. 3:05-cv-73 (CAR), 2006 U.S. Dist. LEXIS 63760, at *4 (M.D. Ga. Sept. 7, 2006) (citations omitted) ("To establish good cause the party must show that the scheduling deadlines could not have been met despite his diligence as to the matter that is the subject of the motion to amend."). In this case, Trilink first learned of the marketing statement that was provided to The Home Depot on March 5, 2008. Less than a month later, on April 4, 2008, Trilink filed its motion to amend to include the new events in support of its claims. Because Trilink promptly moved the court to amend the complaint to include events that occurred after the deadline to amend, the court finds that good cause exists for the amendment.

Having found good cause, the court "may, on just terms," permit a party to supplement its pleadings. Fed. R. Civ. P. 15(d). However, it "should not grant motions to supplement when there is undue delay, bad faith, dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment." Id. "Moreover, leave to amend may be denied when the case has

progressed to an advanced stage and extensive discovery is nearly complete, particularly where the amendment would require additional extensive discovery." Id.

As noted above, Oregon contends that Trilink's proposed supplement is futile because Oregon's new marketing materials have not caused Trilink any harm. In addition, Oregon essentially argues that it will be prejudiced by a supplement at this late date because the supplemental facts will confuse the issues and will distract the parties and potentially a jury.

The court cannot agree that Trilink's proposed supplement is futile; however, the court does find that a supplement at this late stage in the proceeding would be prejudicial to all parties and would cause unnecessary delay in the resolution of this matter. Discovery is complete and summary judgment briefs have been ruled upon. Trilink has requested that this court set this case down for trial at its earliest convenience; in its current status, this case is rapidly heading that way.

However, if the court allows Trilink to supplement its complaint, this case will come to a screeching halt. The new allegations concern a completely new set of tests and marketing materials leading to a new set of injuries. To enable the parties to address these new allegations, the court will have to reopen discovery and set new summary judgment deadlines. Months will pass

without a resolution on this matter. Meanwhile, the parties will continue to compete in the marketplace, and - without the guidance of a resolved dispute - will no doubt continue to goad each other with tactics that are perceived as illegal. New supplements will be requested, and this case will last indefinitely.

The court is mandated to interpret and administer the Federal Rules of Civil Procedure in a manner that ensures the "just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Hence, this court cannot grant Trilink's motion for leave to supplement at this stage of the proceeding. As just described, a supplement will delay the resolution of this matter indefinitely - a result that cannot occur given the increasingly hostile and litigious nature of these marketplace nemeses. This does not mean that Trilink can not proceed against Oregon in relation to those claims; it simply means that it cannot do so in this proceeding.

Because the court is denying Trilink's motion to supplement, there is no need to reopen discovery. Consequently, the parties' requests for additional discovery are denied.

### B. Motion to Supplement Trilink's Response to Oregon's Motion for Summary Judgment

As noted above, Trilink has requested that this court allow it to supplement its response to Oregon's motion for summary judgment

with the evidence contained in its briefs.  Having determined that
these new issues should not be addressed in this proceeding, the
court denies this motion.[22]

**C.    Motion for Immediate Scheduling of Trial**

Trilink has requested that this court set this case for trial
at its earliest convenience.   The court does not find that this
case warrants an immediate, emergency trial; thus, Trilink's motion
is denied.   However, the court is extremely interested in the
speedy and just resolution of this matter; accordingly, it will
ensure that this case is handled in an expeditious manner.

**D.    Summary of Trilink's Motion for Immediate Scheduling of
Trial**

In summary, the court denies Trilink's motion to supplement
its complaint, denies both parties' requests for discovery in
regard to the proposed supplement, and denies Trilink's motion to
supplement its summary judgment brief with evidence related to the
proposed amendment.   The court also denies Trilink's motion for
immediate scheduling of trial, but notes that it will handle this
case in an expeditious manner.

---

[22]    The parties have not had an opportunity to conduct
discovery on these new facts; thus, the court also notes that their
inclusion in the summary judgment record would be premature.

## VI. Conclusion

As described more fully above, this court GRANTS in part and DENIES in part Oregon's motion to exclude Trilink's technical expert, Hal Dunham [Doc. No. 160]; GRANTS Trilink's motion for summary judgment [Doc. No. 149]; GRANTS in part and DENIES in part Oregon's motion for partial summary judgment [Doc. No. 157]; DENIES Trilink's motion to unseal documents [Doc. No. 210]; DENIES Trilink's request for immediate scheduling of trial and all of the sub-motions therein [Doc. No. 216]; and GRANTS Oregon's motion for leave to file a surreply to Trilink's request for immediate scheduling of trial [Doc. No. 220]. As instructed above, the parties are ORDERED to meet and confer regarding de-designating and downgrading the designation of their documents filed under seal. At the conclusion of negotiations, but no later than 20 days from the date of this order, the parties are instructed to submit to the court a list of any documents on which they cannot agree.

Pursuant to Local Rule 16.4, the parties are DIRECTED to submit a consolidated pretrial order within 30 days of the date of this order.

So ordered, this 12th day of September, 2008.


/s/ Charles A. Pannell, Jr.
CHARLES A. PANNELL, JR.
United States District Judge